**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| DONNA BRADEN, | ) | CASE NO. 1:16CV673 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Donna Braden ("Plaintiff" or "Braden"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be VACATED and the case REMANDED for further

proceedings consistent with this Opinion.

## I.    PROCEDURAL HISTORY

In August 2012, Braden filed applications for POD and DIB, alleging a disability onset

date of June 1, 2009 (later amended to August 11, 2011) and claiming she was disabled due to

"manic depressive, bipolar, hypertension, anxiety, high blood pressure, high cholesterol."

(Transcript ("Tr.") 41, 70, 190, 221.)  The applications were denied initially and upon

1

reconsideration, and Braden requested a hearing before an administrative law judge ("ALJ").  (Tr. 143-146, 153-159, 160.)

On November 13, 2014, an ALJ held a hearing, during which Braden, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 62-112.)  On January 26, 2015, the ALJ issued a written decision finding Braden was not disabled.  (Tr. 41-55.)  The ALJ' s decision became final on January 28, 2016, when the Appeals Council declined further review.  (Tr. 1-4.)

On March 18, 2016, Braden filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 16, 17.)  Braden asserts the following assignments of error:

> (1)     The Commissioner's rationale for not crediting the opinion of the Agency's examining clinical psychologist, Dr. Pickholtz, and instead adopting the opinions of the nonexamining state agency consultants was inadequate and not supported by substantial evidence.
>
> (2)     Despite concluding that Ms. Braden suffered from moderate limitations in concentration, persistence, and pace, the Commissioner failed to explain why she was not including any limitations regarding the ability to perform even simple work on a sustained basis.

(Doc. No. 12.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Braden was born in June 1960 and was fifty-three (53) years-old on her date last insured of December 31, 2013, making her a "person closely approaching advanced age" under social security regulations.  (Tr. 54.)  *See* 20 C.F.R. §§ 404.1563(3) & 416.963(d).  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a

2

mold machine operator, ingredient mixer, and bartender.  (Tr. 54.)

**B.    Relevant Medical Evidence**

On August 8, 2011,[1] Braden[2] presented to the Free Clinic for treatment of various

conditions, including her bipolar disorder.  (Tr. 334-335.)  At that time, she was taking

Wellbutrin, Zoloft and Lamictal.  (*Id*.)  She was advised to follow up with behavioral health and

given medication refills.  (*Id*.)

Shortly thereafter, on August 14, 2011, Braden received emergency treatment for a manic

episode and suicidal ideation.  (Tr. 277-314.)  She was brought to the hospital by police after

causing a disturbance while visiting her mother at a nursing home.  (Tr. 284.)  Braden was

"taking her clothes off, trying to give all of her money away, and making bizarre statements."

(*Id*.)  She told a nurse that she intended to crash a car to kill herself.  (*Id*.)  While in the

emergency room, Braden was agitated, impulsive, and labile with flight of ideas and rapid speech.

(*Id*.)  She reported a past history of psychiatric treatment at the Free Clinic but stated "they keep

switching doctors and her medications don't seem to be working."  (*Id*.)

On examination, Braden was in "acute distress."  (Tr. 285.)  She was disheveled, restless,

---

[1] After the ALJ rendered the decision, Braden submitted additional medical evidence to
the Appeals Council relating to treatment she received at the Free Clinic between March
2010 and November 2011. (Tr. 478-521.)  As the Appeals Council denied review, this
Court's review is limited to the record and evidence before the ALJ.  *See Miller v.
Comm'r of Soc. Sec*., 811 F.3d 825, 838 (6th Cir. 2016); *Foster v. Halter*, 279 F.3d 348,
357 (6th Cir.2001); *Walker v. Barnhart*, 258 F.Supp.2d 693, 697 (E.D. Mich.2003); *Fink
v. Comm'r of Soc. Sec*., 2013 WL 3336579 at fn 5 (N.D. Ohio June 25, 2013).  Thus, the
Court will not recount or consider this additional medical evidence.

[2] Prior to December 2012, treatment records refer to Plaintiff as  "Donna Mysliwczyk,"
rather than Donna Braden.  For ease of reference, the Court will refer to Plaintiff as
"Braden" throughout this decision.

irritable, and depressed, with slurred and pressured speech and impaired attention and concentration. (*Id*.) The ER doctor noted a constricted affect, limited insight, and poor judgment, with "flight of ideas" and current suicidal ideation. (*Id*.) Braden was diagnosed with bipolar disorder, most recent episode manic; and was assigned a Global Assessment of Functioning ("GAF")[3] of 30, indicating very serious symptoms. (Tr. 286.) Braden was administered various medications "for safety," including Haldol, Ativan, and Benedryl, and transferred to Northcoast Behavioral Health for further treatment. (Tr. 277, 284, 328-331.)

Braden was admitted to Northcoast Behavioral on August 15, 2011 for emergency inpatient psychiatric care, and discharged on September 22, 2011. (Tr. 277, 328-331.) On admission, she was "very hypomanic" and uncooperative, and required numerous medications. (Tr. 329.) Braden gradually improved with medication and treatment. (Tr. 329.) She was diagnosed at the time of discharge with bipolar disorder, manic type without psychosis, in remission; and assigned a GAF of 70-80, indicating mild symptoms. (Tr. 330.) Mental status examination on discharge was normal. (*Id*.)

Braden returned to the Free Clinic on December 1, 2011. (Tr. 336-337.) She reported taking her medication as prescribed and "doing well." (Tr. 336.) Treatment notes state that, with

---

[3] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 21 and 30 indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

regard to her bipolar, Braden was "currently well controlled."  (Tr. 337.)  In January 2012, Braden was agitated due to the recent death of her mother.  (Tr. 356.)  She had not experienced any mood swings since her last appointment, however, and her mental status examination was normal.  (*Id*.)  Farah Munir, D.O., increased Braden's Vistaril dosage, and advised her to return for follow-up in four to six weeks.  (Tr. 357.)

In February 2012, Braden denied any symptoms of anxiety, stating the Vistaril "had put her at ease and more level and calmed her down from a more elevated mood."  (Tr. 354.)  Mental status examination was again normal, with findings of appropriate and neat appearance, organized and cooperative behavior, fair eye contact, good interaction, clear and distinct speech, good mood, full affect, linear and organized thought form, and intact insight and judgment.  (*Id.*)  Braden was diagnosed with bipolar II, full remission, and advised to continue her medications.  (Tr. 355.)

Braden returned to the Free Clinic on May 23, 2012, stating she was "feeling good" and sleeping well with "good energy."  (Tr. 352.)  Braden "endorsed no anxiety with the help of Zoloft and Vistaril."  (*Id*.)  Mental status examination findings were normal, and her physician described her as "very stable with [her] meds."  (Tr. 352-353.)  In September 2012, Braden presented to Stephanie Pope, M.D.  (Tr. 349.)  She reported "multiple stressors" but "believe[d] herself to be doing well."  (*Id*.)  Mental status examination was normal, with appropriate and neat appearance, organized and cooperative behavior, good eye contact, appropriate interaction, clear and distinct speech, "pretty good" mood, linear and organized thought form, and fair insight and judgment.  (*Id.*)  Dr. Pope diagnosed bipolar I and advised Braden to continue her medications and return for follow-up in four weeks.  (Tr. 350.)

Braden next presented to Dr. Pope on October 17, 2012.  (Tr. 347-348.)  She reported becoming engaged to her boyfriend and was planning her wedding.  (*Id*.)  Braden's blood pressure was elevated and her speech rate was slightly elevated, but her mental status examination was otherwise normal.  (*Id*.)  She was diagnosed with a history of bipolar, and advised to continue her medication.  (*Id*.)

The following month, Braden reported feeling "bad" and "bogged down" with family issues.  (Tr. 390-391.)  She also complained of feeling "'unfocused' while cleaning- going from room to room not completing tasks and 'having trouble concentrating.'" (*Id*.)  Aside from an irritable mood, mental status examination was normal, with findings of appropriate and neat appearance, normal motor activity,  good eye contact, conversational interaction, clear and distinct speech, linear and organized thought form, and intact insight and judgment.  (*Id.*)  Dr. Pope increased the dosage of several of Braden's medications, and stated psychoeducation would be "consider[ed] if compliant with visits (Pt does not want to come frequently. Not an appropriate candidate at this time)." (*Id*.)

Braden presented to the Free Clinic for psychiatric care on four occasions in 2013.[4]  In January of that year, Braden stated "she believes herself to be doing well, sleeping 'ok' ('sleeping more than I want to    9 to 10 hours'), rates low amount of stress."  (Tr. 388-389.)  Her mental status examination    was normal, with findings of appropriate and neat appearance, organized and cooperative behavior, normal motor activity, good eye contact, "pretty good" mood, clear and distinct speech, linear and organized thought form, and intact insight and judgment.  (*Id.*)  Dr.

---

[4] Braden also visited the Free Clinic on several occasions for treatment of various physical health issues, including hypertension, high cholesterol, and leg pain. (Tr. 377-385, 399-400, 408-410.)

Pope noted Braden was "stable on current [medication] regimen."  (*Id*.)  In April 2013, Braden

reported increased stress due to financial struggles.  (Tr. 386-387.)  Mental status examination

findings were normal, although Dr. Pope noted Braden was "focused on financial stress" and

added a diagnosis of anxiety.  (*Id*.)

In August 2013, Braden was seen at the Free Clinic by Shree Sarathy, M.D. (Tr. 404-405.)

Braden reported as follows:

> States she has memory problems and that is why she takes all her meds together in
> the morning.  Cannot take meds 2x per day.  Has difficulty remembering med
> names and doses.  Is applying for disability.  Recently bought a vending machine
> business.  Can't work with other people.  Has not had symptoms exacerbating
> recently.  Main issue is her memory.  Difficulty finding stable job.  Sleeps 9h/night
> average.

(Tr. 404.)  On examination, Dr. Sarathy noted mildly elevated speech rate, reduced memory,

interaction that was "hostile at times," and impaired judgment insight and memory.  (*Id*.)  He

noted Braden "doesn't understand need to take meds/how to take them."  (*Id*.)  He diagnosed

bipolar I disorder and possible anxiety, and continued Braden on her medications (i.e.,

Wellbutrin, Zoloft, Depakote, and Vistaril).  (*Id*.)

Braden returned to Dr. Sarathy on December 4, 2013.  (Tr. 411-412.)  She reported poor

memory and concentration, fluctuating mood, low energy, and manic symptoms.  (*Id*.)  Braden

stated "she feels she has been treated with many different med combinations but nothing has ever

worked to keep her 'even.'"  (*Id*.)  On examination, Dr. Sarathy noted nervous and irritable

behavior, restlessness, good eye contact, "hyper but appropriate" interaction, loud and pressured

speech, "hyper, agitated" mood, labile affect, tangential thoughts, and impaired judgment and

insight.  (*Id*.)  Dr. Sarathy noted Braden "manages her own meds and due to memory issues

cannot remember her meds or how to take them, thus making med changes dangerous." (*Id*.)  He continued Braden on her meds and discussed the importance of medication compliance.  (*Id*.)

On March 16, 2014,[5] Braden was hospitalized in Savannah, Georgia after a manic episode.  (Tr. 394-398.)  She was driving home to Ohio from Florida when she experienced car problems.  (Tr. 396.)  Braden stopped at a Dodge tent sale and became irate when the car repair area was closed.  (*Id*.)  She decided to "show them" by spinning her tires and "turning donuts" in the parking lot.  (*Id*.)  The police were called and she was taken to the ER, where she required medication for agitation.  (*Id*.)  At that time, Braden reported being off medication for seven days and not sleeping.  (*Id*.)  She exhibited flight of ideas, pressured speech, and manic behavior.  (*Id*.)

Braden was diagnosed with bipolar I disorder manic severe without psychotic features.  (Tr. 396.)  She was hospitalized for four days, over which time her mania stabilized with medication management.  (*Id*.)  At the time of her discharge on March 20, 2014, she was alert and oriented, with a pleasant affect, "good" mood, logical thought content, and slightly pressured speech.  (Tr. 398.)  She was assessed a GAF of 60, indicating moderate symptoms.  (Tr. 396.)

Braden returned to Dr. Sarathy on April 2, 2014.  (Tr. 401-403.)  She reported going back on her medication after returning home from Georgia, and feeling "more level since restarting her meds."  (Tr. 401.)  Dr. Sarathy noted Braden did not appear manic and "concentration is adequate for her."  (*Id*.)  Mental status examination revealed appropriate and neat appearance, nervous behavior, good eye contact, "hyper but appropriate" interaction, loud speech, blunted affect, "okay" mood, tangential thought form, and impaired insight and judgment.  (Tr. 402.)  Dr.

---

[5]  The following medical evidence post-dates Braden's DLI but was before the ALJ at the time she rendered her decision and, therefore, will be recounted in this Opinion.

8

Sarathy discussed with Braden transferring her care to a community mental health care center closer to where she lives, and she agreed.  (*Id*.)  He also noted Braden would benefit from a case manager "who can ensure that she comes to appointments and gets her medications and takes them appropriately," as well as a nurse who could do "pill boxes with her on a daily basis so that she can keep better track of her meds."  (*Id*.)

Braden presented for an initial diagnostic assessment at Beacon Health on June 4, 2014.  (Tr. 413-420.)  She requested case management services, reporting she "chronically misses appointments and does not also take her meds on a regular schedule."  (Tr. 418.)  Don Cook, MSW, LISW-S, noted Braden "appeared somewhat manic throughout her assessment."  (Tr. 419.)  He assessed bipolar disorder (current, manic) and borderline personality disorder, and assessed a GAF of 63, indicating mild symptoms.  (*Id*.)

Braden thereafter presented Kristen Mizumoto, PMHNP-BC, at Beacon Health in June, August, September and October 2014.  (Tr. 421-430.)  In June, Braden reported spending "most [of] time in mania," noting "it's really hard being me."  (Tr. 421.)  On examination, Braden was well groomed with a hostile demeanor, average but intense eye contact, euphoric affect, irritable mood, hyperactive and restless behavior, agitated motor activity, rapid and pressured speech, grandiose delusions, flight of ideas, and tangential, loose, and racing thoughts.  (Tr. 422-423.)  She was noted as showing impairment in attention/concentration and insight.  (Tr. 423.)  Ms. Mizumoto described her as "discombobulated, impulsive, racing thoughts, tangential, shopping sprees, pressured speech, loud, irritable, starts lots of businesses, easily ticked off."  (Tr. 423.)  She noted Braden had "pill bottle full of meds   different ones."  (*Id*.)  Ms. Mizumoto described Braden as "markedly ill," continued her medications, and added a prescription for

9

Abilify.  (Tr. 424.)

In August 2014, Braden reported that "things [were] okay."  (Tr. 429.)  She stopped taking Abilify after two weeks because it made her feel "more blah."  (*Id*.)  Although mental status examination findings were within normal limits, Ms. Mizmumoto continued to describe Braden as "markedly ill."  (Tr. 430.)  The following month, Braden reported she was out of medication, had "split from her husband six days ago," and "things [were] not going well."  (Tr. 427.)  Mental examination findings included manic behavior, belligerent and tangential speech, restlessness, grandiose thought process, and erratic behavior including wearing two pairs of glasses and pacing.  (*Id*.)  Ms. Mizumoto prescribed Latuda and advised Braden to return in two to three weeks for follow up.  (Tr. 428.)

Braden returned to Ms. Mizumoto on October 8, 2014, reporting she had received her dissolution papers, was already in another relationship, and had an altercation with her daughter in law that resulted in disorderly conduct charges.  (Tr. 425.)  She was no longer permitted to see her grandchildren.  (*Id*.)  Braden's speech was "better contained" and her thought process linear, although Ms. Mizumoto noted some grandiosity in Braden's perceptions.  (*Id*.)  Ms. Mizumoto assessed bipolar I and borderline personality disorder, and increased Braden's Latuda dosage. (Tr. 426.)

Braden sought emergency room treatment three times in November 2014.  (Tr. 436-477.) On November 3, 2014, Braden presented to the ER for "increased anxiety and agitation that became unmanageable."  (Tr. 440.)  She blamed her condition on her new medication, stating "she has been experiencing panic attacks since starting her Latuda several weeks ago."  (*Id*.) Braden improved after being given Ativan.  (Tr. 445.)  She was discharged that same day with

instructions to follow up with her physicians at Beacon Health.  (*Id*.)  Braden returned to the ER

two days later, on November 5, 2014, reporting "multiple medication changes over the past 6

weeks that have lead to worsening symptoms of bipolar disorder."  (Tr. 452.)  She complained of

debilitating depression with severe worthlessness, hopelessness, and "a desire to be dead."  (*Id*.)

Braden reported feeling overwhelmed by simple tasks, and was found to have poor memory and

concentration.  (*Id*.)  She was stabilized on Ativan and discharged on November 6, 2014.  (*Id*.)

Braden presented to the ER again on November 9, 2014, again complaining of "unmanageable

anxiety" secondary to a change in her medication.  (Tr. 471.)  She stated she "had a recent

medication change and was advised by her prescriber it will take weeks before she sees

improvements."  (*Id*.)  Braden was stabilized on Ativan, and discharged with instructions to

follow up with Beacon Health.  (*Id*.)

**C.**  **State Agency Reports**

On October 25 and 29, 2012, Braden underwent a consultative psychological examination

with Herschel Pickholtz, Ed.D.  (Tr. 361-370.)  At the outset, Dr. Pickholtz noted he "could not

complete the evaluation on the initial date of the evaluation" because of  "difficulty getting

accurate information due to moods and tangential and labile emotions."  (Tr. 361.)  For that

reason, Braden returned four days later, on October 29, 2012, and the evaluation was completed

on that date.  (*Id*.)  In terms of his "sources of data and methods," Dr. Pickholtz stated he had

reviewed Form SSA 3368 and noted "the current findings were also based upon the claimant's

self-report and responses to the mental status evaluation and clinical interview."  (Tr. 362.)

Braden reported a history of depression, mood swings, bipolar disorder, "some mild

psychotic features," and "some" alcohol abuse.  (Tr. 362.)  She claimed to experience moderate to

11

severe affective symptoms three times per month since "years ago," and stated "the duration of these symptoms usually last approximately 3 days each occurrence."  (Tr. 363.)  When asked about her work history, Braden stated she had quit or been fired from numerous previous jobs, due to difficulty concentrating and attending and confrontations with coworkers and supervisors. (Tr. 365.)  Dr. Pickholtz opined that "with current psychiatric treatment, I believe the affective complaints would improve and still remain within the moderate to severe ranges of impairment for three days a month."  (Tr. 363.)  Braden also reported auditory hallucinations for the past two years, occurring four times per week for eight hours per occurrence.  (*Id*.)  She described the hallucinations as "words not expressed by others and she hears the phone ringing."  (*Id*.)

Dr. Pickholtz found that, "with psychiatric treatment, [Braden] was able to resume most daily duties and responsibilities except for 4 days a month."  (Tr. 364.)  He stated "information transmitted by the claimant does not suggest poor compliance with past psychiatric treatment plans."  (*Id*.)  In Dr. Pickholtz's opinion, Braden "was and is able to take the psychiatric medications independently and reliably without the need for ongoing psychiatric involvement such as delivering medications by injection, rather than by self-administration."  (*Id*.)

On mental status examination, Dr. Pickholtz's findings, in relevant part, were as follows:

. . .  Motoric activity was variable.  At times she moved and spoke slowly and at other times her speech was rapid and accelerated.  Her attitude during the evaluation was compliant but she had difficulty responding directly to questions and directives.  I had to repeat my questions and directives frequently.  I couldn't complete the evaluation on the initial date of the evaluation because she would ramble on in extraneous and non-related information and her responses were often tangential and circumstantial.   She had no physical aids.  Her eye contact was variable.

* * *

Her levels of articulation and intelligibility were average but it was very difficult

12

to understand and follow her statements due to rambling, tangential, and circumstantial statements.  Her statements reflected some loosening of associations and at times were not tangentially related.  Her tone varied and at times she would get angry during the evaluation.  When pressured to respond to various questions or directives, her verbalizations would become circumstantial.  She stated she has been having auditory hallucinations over the last 2 years.  Her statements seemed to reflect the presence of a thought disorder.

   * * *

Her affect was somewhat labile and the mood was expansive and variable.  At times she was slow and sad and a short time later she was irritable and angry.  Her facial expressions were consistent with her mood changes and verbalizations.  At times she showed very little emotions and at other times her brow would tighten when she became angry.  She did act angry and irritable when she was encouraged to respond directly to the queries.

(Tr. 366.)  Dr. Pickholtz estimated Braden's overall levels of intellectual functioning yielded an estimated IQ in the low average range.  (Tr. 367.)

Dr. Pickholtz diagnosed Braden with bipolar disorder, with psychotic features in very minimal partial remission; and adjustment order with anxiety.  (Tr. 368.)  He assessed a GAF of 45, indicating serious symptoms.  (*Id*.)  With regard to Braden's functional capabilities, Dr. Pickholtz found that her capacity to understand, remember, and carry out instructions was "slightly impaired" due to her low average IQ.  (Tr. 369.)  He concluded her "capacities to relate to coworkers and supervisors based upon her self-reported work history and her behavior during the evaluation suggests serious issues due to her emotional lability."  (*Id*.)  With regard to her ability to respond to work pressures, Dr. Pickholtz concluded Braden's "capacities to handle the pressures of work secondary to her frequent work problems and many firings and her tendencies to become sad and angry with variability in her thinking reflects a serious impairment."  (*Id*.)  He opined she would benefit from a "robust program of psychiatric treatment."  (*Id*.)

Finally, with regard to her limitations in concentration, persistence, and pace, Dr.

13

Pickholtz found as follows:

> Her capacities for attention and concentration, based upon recall of digits and math computations, fell in the borderline and low average ranges. Her pace was somewhat variable and persistence was somewhat problematic as her thinking became tangential and circumstantial.  Her capacities to perform 1 to 3 step tasks based upon her recent work performance and current responding during the evaluation, suggests serious issues related to her bipolar symptoms.

(*Id.*)

On November 28, 2012, state agency physician Patricia Semmelman, Ph.D., reviewed Braden's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 120-125.)  She concluded Braden had (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, or pace; and (4) "one or two" episodes of decompensation, each of extended duration.  (Tr. 120.)  With regard to Braden's mental functional limitations, Dr. Semmelman found Braden was moderately limited in her abilities to (1) work in coordination with or in proximity to others without being distracted by them; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) interact appropriately with the general public; (4) accept instructions and respond appropriately to criticism from supervisors; and (5) respond appropriately to changes in the work setting.  (Tr. 122-123.)  She found Braden was not significantly limited in her abilities to (1) carry out very short and simple instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary

14

routine without special supervision; (6) make simple work-related decision; (7) ask simple questions or request assistance; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (9) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (*Id.*)  Dr. Semmelman explained the basis of her conclusions as follows:

> The clt [i.e., claimant] indicates she does all [household chores], runs errands, shops on her own, drives, and recently planning her wedding and noted be making 'centerpieces' in the 10/12 session with her YMD.  The [treatment] notes show no problems with concentration and attention for [complaints of] such.  She did 4fw 3bw, serial 7s ok.  No problems with concentration and attention.  The clt was [inpatient] in 2011 for a month or so.  She was in the nursing home visiting her mother and apparently had a manic episode.  She presented at that time as delusional.  The clt reported to the [Consultative Examiner] she continues to have auditory hallucinations, presented as tangential and circumstantial, reports often irritable and sad at least 3 days a week.  The [treatment] over the past year shows she is compliant with meds.  The [mental status examination] shows no evidence of any psychosis at all.  The clt reports her mood is good and given the [mental status examination] she appears to be stable.  She does talk about worrying about money and talks about in the very near future birth of a second grandchild.  Given the [treatment] notes in file both physically (showing Y stable) and Y notes also showing her to be stable, the severity of the information provided to the [consultative examiner] is inconsistent to point less than credible to not credible.  **She can interact occasionally and superficially and receive instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting.  She can cope with the ordinary and routine changes in a work setting which is not fast paced or strict time or production requirements.**

(Tr. 123) (emphasis added).

    In June 2013, state agency physician Karen Steiger, Ph.D., reviewed Braden's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 136, 137-139.)  She concluded Braden had (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration,

persistence, or pace; and (4) "one or two" episodes of decompensation, each of extended

duration.  (Tr. 136.)  With regard to Braden's mental functional limitations, Dr. Steiger affirmed

Dr. Semmelman's assessments.  (Tr. 138-139.)

**D.  Hearing Testimony**

During the November 13, 2014 hearing, Braden testified to the following:

- She has been living with a friend for the past six weeks.  (Tr. 76.)  Her two sons (ages 23 and 25) are living at her home.  (*Id*.)

- She currently services 12 to 15 vending machines to earn income.  She services them approximately once every three weeks, and earns about $400 per month. (Tr. 82-83.)  Prior to that, she owned two food trucks.  She bought the food trucks in 2009 and operated them for approximately four years.  Her income varied over the years, dropping to $300 per week gross income during the last year she operated the food trucks.  (Tr. 85-88.)  She ended up scrapping her food truck business.  (Tr. 89.)

- She also has previous work experience running a mold making machine, mixing ingredients, and bartending.  (Tr. 91-94.)  She was fired from each of these jobs due to confrontations with coworkers and supervisors, making mistakes, and her inability to learn how to use a computer.  (Tr. 94-95.)

- The biggest problem that keeps her from working is her severe anxiety.  (Tr. 95.)  She is afraid of leaving the house, of driving, and of "not being able to be in society."  (*Id*.)  She expressed the fear that she is "going to end up in a psychiatric hospital for the rest of her life."  (Tr. 96.)  She went to the emergency room three times in the previous ten days because she was unable to breathe due to her anxiety.  (*Id*.)  She is now taking Ativan, which "helps for maybe a few hours."  (*Id*.)

- She has also been diagnosed with bipolar disorder.  (Tr. 98.)  This condition used to make her feel manic, but now causes depression.  (*Id*.)  She no longer has "any desire to do anything."  (Tr. 99.)

- She spends most days "doing things that take one to five minutes."  (Tr. 79.)  She lays on the couch and turns on the TV.  (*Id*.)  She spends four to five hours per day lying down.  (Tr. 103.)  She washes the dishes, does laundry, prepares sandwiches and microwave meals for herself, and "blows leaves" in the yard. (Tr. 77-78.)  She drives, but not very often or for long distances.  (Tr. 78.)

16

- She fears leaving the house.  (Tr. 78.)  She has one friend right now.  (Tr. 80.)  Throughout her life, she's "never really had any friends."  (*Id.*)  Aside from her two sons, she does not see her family members.  (*Id.*)

- She does not believe that she can work full time.  (Tr. 104.)  She is "just hoping to be able to get back to being able to do some things besides five to ten minute chores."  (*Id.*)

The VE testified Braden had past work as a vending attendant (light, unskilled, SVP 2); prep-cook (medium, skilled, SVP 5); mold machine operator (performed as medium, unskilled, SVP 2); ingredient mixer (medium, unskilled, SVP 2); and bartender (light, semi-skilled, SVP 3). (Tr. 106-108.)  The ALJ then posed the following hypothetical question:

> First off, I would like you to consider a person with the same age; education; and past work as the claimant; who can perform a full range of exertional work; and can interact occasionally; and superficially.  And by superficially, I mean of a short duration for a specific purpose with both coworkers and supervisors; and should have no direct work with the general public.  And by that I mean no customer service type work.  This individual can perform work with no fast-pace or high production quotas.  Given such a hypothetical individual, first off, would this hypothetical individual be able to perform the claimant's past work, as those occupations are either generally or actually performed?

(Tr. 108-109.)

The VE testified the hypothetical individual would not be able to perform Braden's past work as vending attendant, prep-cook, mold machine operator, ingredient mixer, or bartender. (Tr. 109.)  The VE explained, however, that the hypothetical individual would be able to perform representative jobs in the economy, such as cleaner (medium, unskilled, SVP 2), dishwasher (medium, unskilled, SVP 2), and janitor (medium, unskilled, SVP 2).  (Tr. 109-110.)

The ALJ then asked a second hypothetical that was the same as the first but added the limitation that the hypothetical individual can perform low-stress work; i.e., "no arbitration,

17

negotiation, responsibility for the safety of others, or supervisory responsibility." (Tr. 110.)  The VE testified that such a hypothetical individual could perform the previously identified cleaner, dishwasher, and janitor jobs.  (*Id*.)

The ALJ then added the limitation that "this hypothetical individual might be off task approximately 20 percent of the time due to symptoms from anxiety and depression." (*Id*.)  The VE testified such an individual would not be able to perform the previously identified jobs and, further, would not be able to perform any other jobs in the national economy.  (Tr. 110-111.)

Finally, the ALJ removed the off task limitation and added instead the limitation that "this hypothetical individual might be absent from work approximately four times per month due to symptoms from anxiety and depression." (Tr. 111.)  The VE testified such an individual would not be able to perform the previously identified jobs and, further, would not be able to perform any other jobs in the national economy.  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of

a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6ᵗʰ Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Braden was insured on her alleged amended disability onset date, August 11, 2011, and remained insured through December 31, 2013, her DLI.  (Tr. 41.)  Therefore, in order to be entitled to POD and DIB, Braden must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v.*

*Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.

2.    The claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of August 11, 2011 through her date last insured of December 31, 2013 (20 CFR 404.1571 *et seq*.).

3.    Through the date last insured, the claimant had the following severe impairments: affective disorder (bipolar disorder not otherwise specified (NOS)), anxiety disorder (adjustment disorder with anxiety), and borderline personality disorder (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can interact occasionally and superficially (meaning of a short duration for a specific purpose) with co-workers and supervisors, with no direct work with the general public (i.e., customer service type work) and no fast pace or high production quotas.  She can also perform low stress work meaning no arbitration, negotiation, or responsibility for the safety of others or supervisory responsibility.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on June ** 1960 and was 53 years old, which is defined as a younger individual age 18-49 on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

20

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from August 11, 2011, the amended alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(g)).

(Tr. 41-55.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston*

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

    In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

    Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Weighing of Medical Evidence*

In her first assignment of error, Braden argues the ALJ failed to give adequate reasons for crediting the opinions of the nonexamining state agency physicians over the opinion of consultative examiner Dr. Pickholtz.  (Doc. No. 12 at 10.)  She maintains the reasons provided by the ALJ for rejecting Dr. Pickholtz's opinions are not supported by substantial evidence, arguing "Dr. Pickholtz's report is consistent with Ms. Braden's statements, the statements of her relatives, her multiple hospital admissions and repeated fluctuations in functioning due to her bipolar disorder."  (*Id*. at 13.)  Braden also argues "the ALJ presumed that she was stable on medications but . . . failed to analyze the many instances where there were notations regarding her difficulties with compliance (financial or just remembering to take the medications)."  (*Id*. at 14.)  In particular, she emphasizes treatment notes documenting her memory problems and difficulty "even remembering her medications or why she needed to be on the medications."  (*Id*.)  Braden also complains the state agency records-reviewing physicians failed to conduct any meaningful analysis of Dr. Pickholtz's opinion.  (*Id*.)  Finally, Braden asserts "the ALJ's rationale for rejecting Dr. Pickholtz's opinion was generic, improperly presumed it was based on self-report when it was actually based on Dr. Pickholtz's personal observations and need to postpone the examination due to the severity of the tangential and circumstantial thinking, etc., and also failed

to deal with Ms. Braden's reasons for noncompliance and lack of stability." (*Id*. at 14-15.)

The Commissioner argues the ALJ provided "legitimate reasons" for discounting Dr. Pickholtz's opinion that Braden had serious limitations in her ability to perform work-related mental activities. (Doc. No. 16 at 13.) In particular, the Commissioner asserts the ALJ correctly found Dr. Pickholtz's opinion was not supported by the medical evidence, noting that "treatment notes dated immediately before and after Dr. Pickholtz rendered his opinion were grossly normal." (*Id*.) Indeed, the Commissioner emphasizes that mental status examinations throughout 2012 and in January and April 2013 were consistently within normal limits. (*Id*.) The Commissioner also argues the ALJ properly discounted Dr. Pickholtz's opinion on the ground it was improperly based on Braden's subjective reports, some of which were not supported by the medical record. By way of example, the Commissioner notes that Dr. Pickholtz's opinion was based, in part, on Braden's allegations of hallucinations; however, there is no reference to hallucinations in the medical record either before or after her consultative examination. (*Id*. at 14.) The Commissioner argues the ALJ properly relied instead on the opinions of the state agency psychologists because they provided detailed explanations for their conclusions and their opinions are supported by the record as a whole. (*Id*. at 14-15.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i). Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions. *Id*. When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this

24

section, such as the consultant's medical specialty and expertise in our rules, the supporting

evidence in the case record, supporting explanations the medical or psychological consultant

provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. §

404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the

opinions of a State agency medical or psychological consultant or other program physician,

psychologist, or other medical specialist" unless a treating physician's opinion has been accorded

controlling weight.  *Id.*

 Here, the ALJ determined, at step two, that Braden suffered from the severe impairments

of affective disorder (bipolar disorder not otherwise specified (NOS)), anxiety disorder

(adjustment disorder with anxiety), and borderline personality disorder.  (Tr. 44.)  After finding

Braden's impairments did not meet or medically equal a listing, the ALJ proceeded, at step four,

to consider Braden's self-reported limitations and the medical evidence.  The ALJ first noted

Braden's statements that she cannot concentrate, gets confused, has poor memory, and has

difficulty staying on task as well as remaining focused.  (Tr. 47.)  The ALJ also acknowledged

Braden's hearing testimony that she suffers from severe anxiety and manic episodes.  (*Id.*)

 The ALJ then recounted the medical evidence regarding Braden's mental impairments.

The decision discussed Braden's August 2011 hospitalization,[6] as well as treatment records from

the Free Clinic showing normal mental status examinations and stability on her medication

---

[6] While the ALJ acknowledges Braden was involuntarily admitted for psychiatric
treatment on August 14, 2011, the decision indicates she was discharged two days later
with a GAF of 40.  (Tr. 47.)  In fact, the record indicates Braden was discharged from the
hospital on August 15, 2011 and immediately transferred to Northcoast Behavioral for
emergency inpatient psychiatric care.  (Tr.  277, 286, 328-331.)  Treatment records
indicate she was not discharged from Northcoast until over a month later, on September
22, 2011.  (Tr. 328-331.)

regimen.  (Tr. 47-48.)  Although dated after Braden's DLI of December 31, 2013, the ALJ also recounted Braden's March 2014 hospitalization, subsequent psychiatric treatment at Beacon Health, and repeated emergency room visits for panic attacks in November 2014 .  (*Id*.)

The ALJ next determined Braden's impairments could reasonably be expected to cause the alleged symptoms; however, "her statements concerning the intensity, persistence, and limiting effects of these symptoms was not entirely credible" for several reasons.  (Tr. 49.)  First, the ALJ noted treatment notes documenting Braden's history of non-compliance with appointments and medications.  (*Id*.)  The ALJ then discussed evidence indicating Braden is self-employed with both a food truck and vending machine business, finding "the record suggests that the claimant may have consistently engaged in work activity since her alleged onset date of disability."  (Tr. 50.)

The ALJ then discussed Braden's October 2012 consultative examination with Dr. Pickholtz.  (Tr. 50-53.)  The decision first sets forth a lengthy block quotation from Dr. Pickholtz's report, spanning over two single-spaced pages in length.  (Tr. 50-52.)  The ALJ then discussed Dr. Pickholtz's conclusions as follows:

> The consultative examiner diagnosed the claimant with bipolar disorder NOS with psychotic features in very minimal remission, polysubstance abuse in full remission and adjustment disorder with anxiety and assigned the claimant a GAF score of 45    indicating serious symptoms such as suicidal ideation, severe obsessional rituals, and frequent shoplifting; or any serious impairment in social, occupational, or school functioning such has having no friends or being unable to keep a job.  Dr. Pickholtz further opined that the claimant is slightly limited in her ability to understand, remember and carry out instructions; her capacity to perform 1 to 3 step tasks "based upon her recent work performance and current responding during the evaluation suggests serious issues related to her bipolar symptoms;" "Her capacities to relate to coworkers and supervisors based upon her self-reported work history and her behavior during the evaluation suggests serious issues due to her emotional lability;" "Her capacities to handle the

26

pressures of work secondary to her frequent work problems and many firings and her tendencies to become sad and angry with variability in her thinking reflects a serious impairment." **The undersigned has accorded little weight to this opinion evidence as the consultative examiner did not have the benefit of medical records for longitudinal perspective and is inconsistent with the medical evidence as a whole. As a result and as repeatedly noted in his functional assessment, his opinion is based primarily on the self-reported symptoms and diagnoses provided by the claimant. In this regard, the claimant reported psychotic features such as hallucinations that are not supported by or contained in the medical evidence of record. Indeed, the claimant regularly reports her mood to be good and mental status examinations are consistent with stability with medically compliant.**

(Tr. 52-53) (emphasis added).

The ALJ discussed the remaining opinion evidence regarding Braden's mental

impairments as follows:

> Dr. Klyop[7] further opines that the record indicates that the claimant suffers from severe mental impairments with mild restrictions in her activities of daily living, moderate difficulties with social functioning and her ability to maintain concentration, persistence, and pace with one (1) to two (2) episodes of decompensation of extended duration. It is also opined that the claimant retains the following functional capacity:
>
> > She can interact occasionally and superficially and receive instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting. She can cope with the ordinary and routine changes in a work setting which is not fast paced or strict time or production requirements. (Exhibit 2A, Exhibit 4A).
>
> The findings at the initial determination were affirmed. The undersigned has generally accorded great weight to this opinion evidence as it is consistent with the objective diagnostic and clinical findings as well as the claimant's reported level of functioning during treatment. However and viewing the evidence in the light most favorable to the claimant, the undersigned also finds that the

---

[7] This reference to Dr. Klyop appears to be an error, as Dr. Klyop completed an assessment of Braden's physical functional limitations only. Based on the content of the opinion, the Court believes the opinion noted above is that of state agency psychologist Dr. Steiger.

> claimant is further limited to low stress work.
>
> The undersigned notes that the record contains no medical source statements
> from the claimant's treating physicians.

(Tr. 53.)

The ALJ formulated the following RFC:  "After careful consideration of the entire

record, the undersigned finds that, through the date last insured, the claimant had the residual

functional capacity to perform a full range of work at all exertional levels but with the following

nonexertional limitations:  The claimant can interact occasionally and superficially (meaning of a

short duration for a specific purpose) with co-workers and supervisors, with no direct work with

the general public (i.e., customer service type work) and no fast pace or high production quotas.

She can also perform low stress work meaning no arbitration, negotiation, or responsibility for

the safety of others or supervisory responsibility."  (Tr. 46.)

The Court finds the ALJ properly evaluated Dr. Pickholtz's opinion.  The ALJ discussed

Dr. Pickholtz's examination findings and expressly acknowledged his opinions regarding

Braden's mental limitations.  The ALJ accorded "little weight" to Dr. Pickholtz's opinions and

provided several reasons for doing so.  Specifically, the ALJ noted that Dr. Pickholtz appeared to

rely heavily on Braden's subjective reports regarding her symptoms and limitations.  The ALJ

explained that Braden's self-reported limitations contrasted with both the medical evidence

(including treatment notes indicating normal mental status examinations throughout 2012 and the

beginning of 2013 ) as well as Braden's own statements during several psychiatric visits during

this time period that she was "doing well" and "feeling good."  (Tr.  336, 352, 388-389.)  Of

particular relevance to the ALJ in this regard was Braden's statement during Dr. Pickholtz's

28

examination that she had suffered from hallucinations for the past two years.  As the ALJ

correctly noted, the medical evidence contains no record that Braden complained of

hallucinations during any of her treatment visits prior to (or after) her examination with Dr.

Pickholtz.

Braden asserts, however, that the ALJ's "presumption that Dr. Pickholtz's opinion is

invalid due to her stability on medications fails to properly analyze her difficulty with medication

compliance and lack of understanding."  (Doc. No. 17 at 4.)  The Court rejects this argument.

The record reflects that, in the year just prior to Dr. Pickholtz's October 2012 consultative

examination, Braden presented for psychiatric care on at least six occasions.  During each of

these visits, Braden reported improvement with medication, and her mental status examination

findings were grossly normal.  For example, in December 2011, Braden reported taking her

medication and "doing well." (Tr. 336-337.)  Treatment notes from this visit state that Braden's

bipolar was "well controlled."  (*Id*.)  In January 2012, Braden reported no mood swings since her

last appointment.  (Tr. 356-357.)  Her mental status examination was normal.  (*Id*.)  In February,

Braden reported her anti-anxiety medication had been effective.  (Tr. 354-355.)  Again, her

mental status examination findings were normal.  (*Id*.)  In May, Braden reported "feeling good"

and "endorsed no anxiety with the help of Zoloft and Vistaril."  (Tr. 352-353.)  Mental status

examination findings were normal and her physician described her as "very stable with meds."

(*Id*.)  In September 2012, Braden's mental status examination was normal despite the fact she

reported "multiple stressors."  (Tr. 349.)  Finally, on October 17, 2012 (just two weeks prior to

Dr. Pickholtz's examination), Braden's mental status examination was again normal, aside from

slightly elevated speech rate.  (Tr.  347-348.)

In light of the above, the Court finds the ALJ reasonably rejected Dr. Pickholtz's opinion on the grounds that it was inconsistent with mental status examinations showing stability with treatment.  While treatment records beginning in August 2013 show fluctuations in symptoms and medication compliance issues (discussed in greater detail, *infra*), the record indicates that, *at the time Dr. Pickholtz rendered his opinion*, Braden had been consistently taking her medications and showing improvement and stability with treatment.  Indeed, Dr. Pickholtz himself states that "information transmitted by the claimant does not suggest poor compliance with past psychiatric treatment plans," leading him to conclude that "she was and is able to take the psychiatric medications independently and reliably without the need for ongoing psychiatric involvement such as delivering medications by injection, rather than by self-administration."  (Tr. 364.)  Thus, the Court finds ALJ properly discounted Dr. Pickholtz's opinion on the grounds it was inconsistent with contemporaneous treatment notes showing Braden was taking her medication, showing improvement, and exhibiting normal findings on mental status examination in the months prior to and just after Dr. Pickholtz's examination.

In sum, the ALJ acknowledged Dr. Pickholtz's opinion and articulated several reasons for discounting it, including its supportability and consistency with other evidence in the record. As the Commissioner correctly notes, Dr. Pickholtz was not Braden's treating physician and, therefore, the ALJ was not required to satisfy the "good reasons" requirement in rejecting his opinion.  *See Taylor v. Colvin*, 2013 WL 6162527 at * 16 (N.D. Ohio Nov. 22, 2013) ("Notably, the procedural 'good reasons' requirement does not apply to non-treating physicians").  The analysis provided by the ALJ well satisfies the explanation requirements for non-treating, examining physicians.

Accordingly, the Court finds the ALJ did not err in rejecting Dr. Pickholtz's opinion regarding Braden's mental functional limitations. Braden's first assignment of error is without merit.

### RFC/Hypothetical Question

Braden next argues the ALJ erred in failing to accommodate her moderate limitations in concentration, persistence, and pace. (Doc. No. 12.) She notes the ALJ found Braden had moderate limitations in this regard based on evidence that Braden gets confused while driving, sometimes forgets how to use the remote control, has trouble staying on task and maintaining focus, and has problems remembering when to take her medications. Braden asserts that, despite acknowledging these concentration deficits, the ALJ "failed to incorporate the types of limitations identified under his findings regarding concentration, persistence, and pace into the residual functional capacity assessment or the hypothetical question." (*Id*. at 17.) Specifically, Braden complains "the ALJ in this case did not include any limitations regarding the need for very simple tasks, even though the facts that led her to find moderate limitations in this area had to do with being unable to do very simple things, such as remembering to take medications or using a remote control." (*Id*. at 18.) Braden argues that, by failing to include any limitations regarding the need for simple, routine and repetitive work, the ALJ failed to address "the complexity of the work or the level of detail of the instructions that Ms. Braden could perform." (Doc. No. 17 at 6.) Thus, Braden argues the RFC is not supported by substantial evidence.

The Commissioner asserts substantial evidence supports the ALJ's RFC assessment. (Doc. No. 16 at 16.) She maintains the ALJ "more than accounted for" Braden's moderate deficiencies in concentration, persistence, or pace in her RFC determination when she limited

Braden to no fast pace or high production quotas and low stress work meaning no arbitration, negotiation, or responsibility for the safety of others or supervisory responsibility.  The Commissioner further asserts "the VE listed and the ALJ found that Plaintiff remained capable of performing all unskilled jobs," arguing "unskilled work is work that needs little or no judgment to do simple duties" and, therefore, such work accommodates a limitation in concentration by definition.  (*Id*. at 17.)  Thus, the Commissioner argues, "by identifying only unskilled occupations, the ALJ fully accounted for Plaintiff's concentration limitations in her RFC determination." (*Id*.)  Finally, the Commissioner argues any error was harmless because "there are certainly jobs in the national economy" consistent with the ALJ's RFC determination.

The RFC determination sets out an individual's work-related abilities despite their limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence.  *See* 20 C.F.R. § 416.946(c).  "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence."  *Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at * 7 (W.D. Mich. Mar. 26, 2012) (citing *Mullins v. Sec'y of Health & Human Servs*., 680 F.2d 472 (6th Cir. 1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 807 (6th Cir. 2008)).

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant.  *See Varley v. Sec'y of Health &*

*Human Servs*., 820 F.2d 777, 779 (6th Cir. 1987).  Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant.  *See Blacha v. Sec'y of Health & Human Servs*., 927 F.2d 228, 231 (6th Cir. 1990).  In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible.  *Griffeth v. Comm'r of Soc. Sec*., 217 Fed. Appx. 425, 429 (6th Cir. 2007) (citing *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)). However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence. *See Ealy,* 594 F.3d at 516 ("In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."); *Brooks v. Comm'r of Soc. Sec*., 531 Fed. Appx. 636, 644 (6th Cir.  Aug. 6, 2013) ("We have stated on a number of occasions that a hypothetical question posed to a vocational expert must include a 'complete assessment of [the claimant's] physical and mental state and should include an accurate portrayal of her individual physical and mental impairments.'") (citing *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 239 (6th Cir. 2002)); *Varley*, 820 F.2d at 779.

Here, the ALJ found Braden had moderate difficulties in concentration, persistence and pace at step three of the sequential evaluation process.  (Tr. 45.)  The ALJ explains this finding as follows:

> The claimant reports difficulty with her ability to maintain concentration and has gotten confused while driving.  She indicates that she sometimes hesitates when using the remote control for the television, as she doesn't immediately remember how to use it.  (Exhibit 7E).  Correspondence from a friend and former co-worker of the claimant indicates that the claimant has trouble

33

> staying on task from time to time and maintaining focus (Exhibit 16E).  The record also indicates that the claimant has had problems remembering to take her medications and her care was transferred from the Free Clinic to Beacon Health, a provider closer to home to assist her with maintaining compliance with her medication regimen (Exhibit 10F).  This would suggest moderate difficulty with her ability to maintain concentration, persistence, and pace.

(Tr. 45.)

In discussing the evidence at step four, the ALJ recounted Braden's statements and testimony that she cannot concentrate, becomes confused, has poor memory, and has difficulty staying on task as well as remaining focused.  (Tr. 47.)  The ALJ then accorded "great weight" to the state agency psychologist's opinion (including the determination that Braden has moderate difficulties in her ability to maintain concentration, persistence, and pace), noting "it is consistent with the objective diagnostic and clinical findings as well as the claimant's reported level of functioning during treatment."  (Tr. 53.)  The ALJ incorporated the state agency psychologists' opinions regarding Braden's mental functional limitations into the RFC and further limited Braden to low stress work.  (*Id*.)  Specifically, the ALJ's RFC determination is as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: **The claimant can interact occasionally and superficially (meaning of a short duration for a specific purpose) with co-workers and supervisors, with no direct work with the general public (i.e., customer service type work) and no fast pace or high production quotas. She can also perform low stress work meaning no arbitration, negotiation, or responsibility for the safety of others or supervisory responsibility.**

(Tr. 46.)

Here, Braden contends the ALJ's RFC determination is internally inconsistent and unsupported by substantial evidence, because it failed to include restrictions to accommodate her

moderate limitations in concentration, persistence, and pace.  In making this argument, Braden

cites to *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Cir. 2010), to support her

contention that the ALJ's hypothetical    and RFC    did not sufficiently address her limitations in

concentration.  In *Ealy*, the record showed that the claimant had a limited ability to maintain

attention over time, even when performing simple, repetitive tasks.  *Ealy*, 594 F.3d at 516.

Specifically, a state agency psychological consultant limited the claimant's ability to sustain

attention to complete simple repetitive tasks to "[two-hour] segments over an eight-hour day

where speed was not critical."  *Id*.  The ALJ, however, limited the claimant only to simple,

repetitive tasks without any additional time-based limitations.  The Sixth Circuit found the ALJ

failed to adequately capture the claimant's limitations in concentration, persistence, and pace. *Id*.

    As courts within this District have noted, "*Ealy* undoubtedly stands for the proposition

that an ALJ's hypothetical to a VE must adequately describe a claimant's limitations in order to

serve as substantial evidence in support of the ALJ's conclusions."  *Gonzalez v. Colvin*, 2014 WL

1333713 at * 9 (N.D. Ohio March 28, 2014).  *See also Lupton v. Colvin,* 2016 WL 451359 at fn 4

(N.D. Ohio Jan. 12, 2016);  *Hubbard v. Colvin*, 2013 WL 5466644 at * 17 (N.D. Ohio Sept. 30,

2013); *Harvey v. Colvin*, 2013 WL 1500688, *11 (N.D. Ohio April 10, 2013).  However, *Ealy*

"does not require further limitations in addition to limiting a claimant to 'simple, repetitive tasks'

for every individual found to have moderate difficulties in concentration, persistence, or pace."

*Jackson v. Comm'r of Soc. Sec*.,  2011 WL 4943966, at *4 (N.D. Ohio Oct.18, 2011).  Rather,

"*Ealy* stands for a limited, fact-based ruling in which the claimant's particular moderate limitations

required additional speed-and pace-based restrictions."  *Id*. at 4.

    Here, the record supports Braden's contention that the ALJ erred by failing to incorporate

restrictions related to her moderate limitations in concentration in the RFC and hypothetical.  At step three, the ALJ found Braden had moderate limitations in concentration, persistence, and pace.[8]  Moreover, the ALJ reaffirmed this finding at step four when she accorded "great weight" to state agency psychologist Dr. Steiger's determination that Braden had moderate difficulties in her ability to maintain concentration, persistence, and pace.  (Tr. 53.)  Additionally, there is evidence in the record to support moderate concentration deficits.  As set forth *supra*, treatment records beginning in August 2013 (prior to Braden's DLI) consistently show complaints of memory and concentration problems, including difficulty remembering medication names and dosages.  For example, in August 2013, Braden reported "she has memory problems and that is why she takes

---

[8]  There is some disagreement among district courts in this Circuit regarding whether an ALJ is required to account for moderate limitations in concentration, persistence, and pace in the RFC when there is finding of such limitations at step three.  A number of courts within this District have answered the question in the affirmative, remanding where an ALJ finds moderate difficulties in concentration, persistence, and pace, or social functioning, at Step Three but then fails to account for them in the RFC.  *See e.g., Acosta-Padilla v. Comm'r of Soc. Sec.*, 2016 WL 3148610 at * 9 (N.D. Ohio May 5, 2016) ("at Step Three the ALJ found that Plaintiff had moderate difficulties with regard to concentration, persistence or pace, and was thus required to account for such limitations in the RFC.")*; Widok v. Comm'r of Soc. Sec.*, 2014 WL 4064043 at * 14 (N.D. Ohio Aug. 15, 2014) (same)*; Gonzalez v. Colvin*, 2014 WL 1333713, at *9 (N.D. Ohio Mar. 28, 2014) (remanding because the ALJ did not explain why her RFC finding omitted social functioning restrictions altogether when the ALJ determined at Step Three of her analysis that plaintiff was moderately limited in his ability to maintain adequate social functioning).  Other courts in this District have disagreed, finding that "if a plaintiff fails to come forward with evidence in the record to support moderate limitations, the ALJ is under no obligation to incorporate unsupported limitations concerning concentration, persistence, or pace into the RFC, regardless of his or her step three determination." *Coates v. Comm'r of Soc. Sec.,* 2014 WL 1224460 at * 6 (N.D. Ohio March 24, 2014) (collecting cases).  This Court need not decide the issue because, as discussed below, (1) the ALJ in the instant case reaffirmed a finding of moderate difficulties in concentration, persistence, and pace at Step Four, and (2) Braden has come forward with evidence in the record supporting her claim of moderate limitations in concentration.

all her meds together in the morning."  (Tr. 404.)  Dr. Sarathy noted impaired memory and found

Braden "doesn't understand need to take meds/how to take them."  (*Id.*)  In December 2013,

Braden again reported poor concentration and memory, and Dr. Sarathy again observed that

Braden "cannot remember her meds or how to take them."  (Tr. 411-412.)  Records post-dating

Braden's DLI (which were discussed by the ALJ at step four) also showed impairment in attention

and concentration.  (Tr. 423, 452.)

      Notwithstanding the above, the ALJ did not include restrictions in the RFC that

specifically account for Braden's moderate limitations in concentration.  (Tr. 46.)  While the RFC

arguably accounted for Braden's limitations in pace and persistence by limiting her to "no fast

pace or high production quotas" and "low stress work meaning no arbitration, negotiation, or

responsibility for the safety of others or supervisory responsibility," the Court finds these

restrictions are not adequate to address her *concentration* deficits, which are most commonly

addressed by a restriction to simple, routine work.  *See e.g., Deaton v. Comm'r of Soc. Sec.*, 2013

WL 2897888 at * 9-10 (S.D. Ohio June 13, 2013) (hypothetical including "restriction against strict

production requirements failed to account for plaintiff's moderate limitations in concentration and

persistence and stress tolerance that the ALJ found to be supported by the evidence of record");

*Kline v. Comm'r of Soc. Sec.*, 2013 WL 1947164 at * 5 (N.D. Ohio April 17, 2013) (explaining

that the claimant's limitations in concentration and persistence were satisfied when the RFC

limited her to "simple, routine, repetitive, one or two step tasks"); *Dultmeyer v. Comm'r of Soc.

Sec.*, 2014 WL 991900 at * 18 (N.D. Ohio March 13, 2014) ("The RFC limits [the claimant] to

simple, routine work which adequately addresses the issue of concentration.")  In other words, the

RFC fails to include restrictions that address the complexity of the work or the level of detail of

the instructions that Braden could perform.  Additionally, the ALJ failed to explain why no restrictions were necessary in the RFC to account for Braden's moderate limitations in concentration.

The Commissioner argues the RFC is supported by substantial evidence because the ALJ properly rejected Dr. Pickholtz's opinion, and neither of the state agency psychologists (i.e., Dr. Semmelman and Dr. Steiger) opined that Braden required a restriction specific to her concentration deficits, such as a limitation to simple, routine and repetitive tasks.  The Court notes, however, that both Dr. Semmelman's November 2012 opinion and Dr. Steiger's June 2013 opinion were rendered prior to the treatment records discussed above showing increased impairment in attention and concentration.  Thus, at a minimum, the ALJ should have addressed whether additional restrictions beyond those set forth in Dr. Semmelman's and Steiger's opinions were necessary to account for Braden's moderate limitations in concentration, persistence, and pace.  *See Brooks v. Comm'r of Soc. Sec.*, 531 Fed. Appx. 636, 642 (6th Cir. Aug. 6, 2013) ("When an ALJ relies on a non-examining source who 'did not have the opportunity to review' later submitted medical evidence, especially when that evidence 'reflects ongoing treatment,' we generally require 'some indication that the ALJ at least considered these [new] facts. . .'") (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009)).

The Commissioner next argues remand is not necessary because "the VE and the ALJ found that Plaintiff remained capable of performing all unskilled jobs."  (Doc. No. 16 at 17.) Citing the regulatory definition of the term, the Commissioner asserts "unskilled work" is work that needs little or no judgment to do simple duties and, therefore, by definition accommodates a limitation in concentration.  *See* 20 CFR § 404.1568(a).  The Commissioner argues that "[b]y

identifying only unskilled occupations, the ALJ fully accounted for Plaintiff's concentration limitations in her RFC determination."  (Doc. No. 16 at 17.)

The Court disagrees.  The fact that the VE identified unskilled jobs in response to the hypothetical questions that were posed does not render the failure to account for Braden's concentrational deficits harmless.  As district courts within this Circuit have noted, "[t]he fact that a job is simple and unskilled has nothing to do with whether or to what degree a worker's moderate concentrational deficiencies will affect the timely completion of that job, and indeed, courts have found such descriptions insufficient to address deficiencies."  *Candela v. Astrue*, 2011 WL 3205726 at * 11 (N.D. Ohio July 28, 2011) (citing *Frederick v. Comm'r of Soc. Sec.*, 2011 WL 1518966 at *6 (E.D. Mich. March 25, 2011) (citing *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir.1996)).  *See also Badour v. Comm'r of Soc . Sec.*, 2011 WL 3320872 at & 8 (E. D. Mich. July 18, 2011) ("While the ALJ need not use talismanic language or the phrase 'moderate deficiencies in concentration, persistence, and pace' in the hypothetical to avoid remand, *see Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), 'unskilled work,' or 'simple work' are generally insufficient to account for moderate concentrational impairments."); *Holstein v. Comm'r of Soc. Sec.*, 2014 WL 5802861 at * 6 (S.D. Ohio Nov. 7, 2014) (finding "the statement that 'a moderate limitation in concentration, pace, and persistence is encompassed in unskilled work' seems especially hard to reconcile with *Ealy*, and this Court, in the decisions cited above, has not reached the same conclusion.")

Here, none of the hypothetical questions posed to the VE included a restriction that either limited Braden to "unskilled work" or addressed Braden's concentrational deficits.  (Tr. 108-111.) In order for a VE's testimony in response to a hypothetical question to serve as substantial

evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray the claimant's impairments.  *See Varley*, 820 F.2d at 779; *Ealy*, 594 F.3d at 516. As the hypothetical questions to the VE did not include limitations accounting for Braden's moderate concentration deficits, the Court cannot find that the VE's testimony carries the Commissioner's burden at step five.  *See Widok*, 2014 WL 4064043 at * 14 ; *Cortes v. Astrue*, 2012 WL 4050157 at * 7 (N.D. Ohio Sept. 13, 2012).  *See also Frederick*, 2011 WL 1518966 at * 6 ("The failure to account for concentrational deficiencies constitutes reversible error . . . "[M]oderate deficiencies suggest substantial limitations which should be acknowledged in the hypothetical question."); *Herriman v. Apfel*, 2000 WL 246598 (E.D. Mich., Feb. 11, 2000) (remanding case where ALJ's hypothetical failed to account for claimant's concentration deficiencies).

Accordingly, the Court finds the ALJ's RFC determination is not supported by substantial evidence.  Remand is necessary to allow the ALJ the opportunity to determine the effect of Braden's moderate limitations in concentration on the VE testimony and RFC.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this Report & Recommendation.

 *s/Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 17, 2017

40

## OBJECTIONS

   **Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

41